UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Takeia King,

      *Plaintiff*,

      v.

**Preferred Call Services, LLC,**
**James M. Bartlett,**
**Niibin, LLC,** *and*
**LDF Holdings, LLC,**

      *Defendants*.

Case Number:

Ad Damnum: **$2,000 + Atty Fees and Costs**

**JURY TRIAL DEMANDED**

**COMPLAINT & DEMAND FOR JURY TRIAL**

COMES NOW the Plaintiff, **Takeia King** ("**Ms. King**"), by and through her attorneys, Seraph Legal, P.A., and complains of the Defendants, **Preferred Call Services, LLC** ("**Preferred Call Services**"), **James M. Bartlett** ("**Bartlett**"), **Niibin, LLC** ("**Niibin**"), and **LDF Holdings, LLC** ("**LDF Holdings**") (collectively, the "**Defendants**"), stating as follows:

**PRELIMINARY STATEMENT**

1.     This is an action brought by Ms. King against the Defendants for violations of the ***Fair Credit Reporting Act***, 15 U.S.C. § 1681, *et seq.* ("**FCRA**").

**JURISDICTION AND VENUE**

2.     Subject matter jurisdiction arises under the FCRA, 15 U.S.C. § 1681p, and 28 U.S.C. § 1331.

3.      The Defendants are subject to the provisions of the FCRA and to the jurisdiction of this Court pursuant to 28 U.S.C. § 1331.

4.      Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §1391(b)(2) because the acts complained of were committed and / or caused by the Defendants therein.

## PARTIES

### Ms. King

5.      **Ms. King** is a natural person who resides in Tampa, Hillsborough County, Florida, and a *Consumer* as defined by 15 U.S.C. § 1681a(c).

### Preferred Call Services and Bartlett

6.      **Preferred Call Services** is a Nevada limited liability company registered with the Florida Secretary of State, with a principal address of **2158 SW Balata Terrace, Palm City, FL 34990**.

7.      **Bartlett** is a natural person, the owner and registered agent of Preferred Call Services, and the beneficial owner of the online payday website cashaisle.com. He resides at **2158 SW Balata Terrace, Palm City, FL 34990.**

### Niibin

8.      **Niibin**, doing business as **Cash Aisle** (sometimes spelled **Cash Ai$le**), is a limited liability company that conducts online lending via its website, www.cashaisle.com.

9.      **Niibin** claims to be a wholly owned subsidiary of LDF Holdings.

10.     Niibin does business in Hillsborough County over the internet, via text message, via *Automated Clearing House* ("**ACH**") transactions, and over the telephone.

## LDF Holdings

11.     **LDF Holdings** claims to be a wholly owned subsidiary of the *Lac du Flambeau Band of Lake Superior Chippewa Indians* (the "**LDF Tribe**").

12.     The LDF Tribe claims that LDF Holdings operates from the second floor of a cigarette store called the Smoke Shop at **597 Peace Pipe Road, Lac du Flambeau, WI 54538. SEE PLAINTIFF'S EXHIBIT A.**

13.     According to her LinkedIn profile, as well as information posted on LDF Holdings' website, Jessie Lee Phillips Lorenzo is the president of LDF Holdings despite not being a member of the LDF Tribe. **SEE PLAINTIFF'S EXHIBITS B and C.**

14.     Lorenzo resides at **502 S. Fremont Ave., Apt. 1107, Tampa, FL 33606**.

15.     Despite frequently transacting business in Florida, having employees in Florida, and having appointed agents and contractors in Florida, LDF Holdings has never registered with the Florida Secretary of State as a foreign corporation doing business in Florida.

## FACTUAL ALLEGATIONS

### Bartlett's Usurious Loans Prohibited in Florida

16.     The State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.

17.     Section 687.071(3), Florida Statutes, renders the issuing of loans with annual interest rates greater than 45% a third-degree felony.

18.     Section 687.071(7), Florida Statutes states: "No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."

19.     Thus, any person who willfully makes such a loan, in addition to subjecting themselves to criminal sanctions, forfeits the right to collect payment for the loan, as such loans are "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935). *See also Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *River Hills, Inc. v. Edwards*, 190 So.2d 415 (Fla. 2d DCA 1966).

20.     Cash Aisle is an online payday lender operating from cashaisle.com, which offers loans to consumers at annual interest rates in excess of 500% annually.

21.     As such, loans made by Cash Aisle to consumers in Florida are in violation of Florida's usury statutes.

22.     Typically, Cash Aisle's borrowers are charged 788% annual interest. As an example, at this interest rate, an **$800** loan would result in interest of $4,419.83 and total repayment of **$5,219.83** for a **10-month** loan.

23.     According to cashaisle.com, its loans are offered by Niibin, LLC, which is owned by the LDF Tribe and, purportedly, has its offices at 597 Peace Pipe Rd., 2nd Floor, Lac Du Flambeau, WI 54538. With its tribal ownership, Niibin *claims* it has sovereign immunity from criminal prosecution regarding its lending practices, which constitute felonies in many states, including Florida.

24.     However, the idea that Cash Aisle is "tribally" owned is utter fiction. As detailed further below, non-tribal investors are the true beneficial owners of Niibin and its related lending websites. The LDF Tribe simply claims ownership of the website as part of a "rent-a-tribe" scheme, and its involvement in the lending business is nothing more than superficial. Its primary contribution is providing a cloak of sovereign immunity as straw owners, giving the true owners protection from criminal and civil charges.

## Bartlett's Role in the Payday Lending Industry

25.     Bartlett has been a loan shark since the 1990s, initially operating storefront payday lenders in Illinois.

26.     In the early 2000s, Bartlett expanded to New Mexico, because "there was no usury cap" in the state. *State of New Mexico vs. B&B Investment Group d/b/a Cash Loans Now,* Docket 34,266, Supreme Court of New Mexico, June 26, 2014.

27.     For a number of years, Bartlett attempted to outfox state regulators who sought to crack down on abusive lending practices like the ones in which Bartlett engaged. For example, in 2005, after Illinois enacted the Payday Reform Act, Bartlett rebranded his company's loans as "signature loans." Bartlett did the same in New Mexico right before the state implemented payday loan reforms in 2007.

28.     In 2014, Bartlett and his prior company, B&B Investment Group, Inc., which did business as Cash Loans Now, were sued by the New Mexico State Attorney General for unconscionable business practices. Among other allegations recounted by the attorney general was that Bartlett's operations collected $991 on a $100 loan made at 1,147% annual interest from a grocery store worker who did not complete the ninth grade.

In defense of the suit, Bartlett's expert posited that the loans were legal, stating that because there was no interest rate cap in New Mexico, then no interest rate should violate public policy – even an interest rate of 11 million percent should be legal. As a further extension of this argument, Bartlett's expert said it would be acceptable for a borrower to agree to harvest a kidney in exchange for $100.

29.     Ultimately, the court found that while there was no *per se* interest rate cap on loans under New Mexico law, Bartlett's behavior was unconscionable, and unconscionable business practices did run afoul of the law.

30.     Bartlett viewed the court's decision as only a minor setback and pivoted to another method of evading state usury laws, making a "rent-a-tribe" deal with the LDF Tribe.

31.     In this deal, the LDF Tribe claims to own and operate Bartlett's online payday lender Cash Aisle, purporting to make Cash Aisle an "arm of the tribe" and thus protected from state usury laws under the cloak of the LDF Tribe's sovereign immunity. In exchange for the use of its name, the LDF Tribe is paid about 2 cents for every dollar of profit made by the lender.

### Origins of LDF Holdings and Tribal Payday Loan Operations

32.     In 2008, the LDF Tribe issued $50 million in bonds and entered into a Trust Indenture to refinance and consolidate debts associated with the Lake of the Torches Casino Facility, and to build a riverboat casino, hotel and Bed & Breakfast. *Wells Fargo Bank N.A. v. Lake of the Torches Econ. Dev. Corp.* 677 F. Supp. 1056, 1057 (E.D. Wis. 2010).

33.     The project was "plagued with problems since it began" and never generated the income needed to pay the bonds. Instead the LDF Tribe was not only unable to make the bond payments, but "was forced to reduce and eliminate many programs that [were] important to the health and welfare of the tribal members." *Id* at 1057-1058.

34.     The LDF Tribe attempted to restructure the bonds in 2009 but was unsuccessful.

35.     The LDF Tribe stopped making payments on the bond in 2009, alleging that its contract with its lender effectively created a management contract in violation of the Indian Gaming Regulation Act. *Id.* at 1059.

36.     In 2013, facing dire economic circumstances, the LDF Tribe looked for other ways to shore up its finances.

37.     In May 2013, the LDF Tribe set about establishing an internet lending operation which would offer short-term, high-interest-rate loans to consumers via the internet.

38.     However, given the LDF Tribe's poor economic situation and credit history, it was unable to obtain credit from traditional sources to fund its new payday lending enterprise.

39.     As of May 2013, the LDF Tribe had neither experience in payday lending, nor knowledge of how to underwrite, collect, or service payday loans.

40. An article published in the LDF Tribe's newsletter, *Inwewin*, in July 2013 noted that the tribe had embarked on a new internet lending business. **SEE PLAINTIFF'S EXHIBIT D.**

41. The July 2013 article stated that "the [LDF Tribe] has partnered with one of the largest and most experienced lending companies." *Id.*

42. In fact, the LDF Tribe entered into agreements with several non-tribal owners of internet lending companies, including, without limitation, Bartlett and Preferred Call Services.

43. For each of these agreements, the LDF Tribe, through its wholly owned subsidiary LDF Holdings, created an LLC, the operations of which were then turned over to its investors.

44. In no case did the LDF Tribe actually manage, control, or operate the internet lending LLCs.

45. Because the LDF Tribe, through LDF Holdings, initially created the LLCs, these companies appeared to be owned by the LDF Tribe and were thus ostensibly privileged with sovereign immunity from various state and federal lending laws that limit interest rates.

46. Most of the LLCs are named after words in the LDF Tribe's native Ojibwe language to further the façade of tribal ownership, *e.g.* Niibin means "summer."

47. In exchange for the use of the LDF Tribe as a purported shield from US law, the investors in these LLCs agreed to pay the Tribe a small percentage – often less than 3% – of each loan they made to a consumer.

48.    The LDF Tribe, in essence, rented out its name, allowing others to conduct business under it.

49.    Brent McFarland, the LDF Tribe's director of business development, told the *Milwaukee* Journal Sentinel that "we're looking for ways to leverage (the tribe's) sovereignty" for profit. Cary Spivak, *Lac du Flambeau Chippewa enter payday loan business with eye to online gambling*, Milwaukee Journal Sentinel, Dec. 29, 2013, http://archive.jsonline.com/business/lac-du-flambeau-chippewa-enter-payday-loan-business-with-eye-to-online-gambling-b99164952z1- 237906421.html.

50.    Agreements under which a non-tribal company attempts to circumvent state and federal laws which would otherwise prohibit usurious loans, by licensing the tribe's name / identity, are commonly referred to as "rent-a-tribe" schemes.

51.    In "rent-a-tribe" schemes, the tribal lending entity is usually a mere "front" for what is actually an illegal lending scheme; the Native American tribe involved has no real part in the operations of the business, and all substantive aspects of the payday lending operations – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals unaffiliated with the Native American Tribe.

52.    The LDF Tribe's internet lending operations were intended to lend money to consumers at astronomically high interest rates.

53.    Even the Tribe's July 2013 *Inwewin* article acknowledged that "some view payday loan and internet lending businesses as predatory, with companies taking advantage

of individuals already in unpleasant financial situations." **SEE PLAINTIFF'S EXHIBIT D.**

54.    Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, Scott Tucker and Timothy Muir, who operated a network of tribal lending companies, were convicted on 14 felony counts in the U.S. District Court for the Southern District of New York. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y).

55.    Sovereign immunity does not turn an otherwise illegal loan into a legal one; at best, it potentially creates a defense to the criminal or civil prosecution of the crime. *See, e.g., United States v. Neff*, No. 18-2282 (3d Cir. Sep. 6, 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

56.    Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

### LDF Tribe Makes Myriad Deals to Rent its Sovereign Immunity

57.    Within a short period of time, the LDF Tribe became one of the most prolific purveyors in the rental market for sovereign immunity, making "rent-a-tribe" agreements

with **over 50 different non-tribal investors**, both domestic and international – many of whom have their own history of questionable business practices.

58.    The LDF Tribe claims to own Ningodwaaswi, LLC ("**Ningodwaaswi**"), which does business as **Sky Trail Cash** and operates the website skytrailcash.com. Ningodwaaswi means "six" in Ojibwe.

59.    In reality, Sky Trail Cash is owned by Texas payday loan magnate William C. "Cheney" Pruett ("**Pruett**"), who public records show owns the barely disguised SkyTrail Servicing Group, LLC, in Texarkana, Texas. Nearly operating out in the open, Sky Trail Cash reports tradeline data on its loans to FactorTrust, Inc. ("**FactorTrust**"), a nationwide *Consumer Credit Reporting Agency* ("**CRA**"), under its own name and address in Texas.

60.    The LDF Tribe claims to own **Niswi, LLC** ("**Niswi**"), which, until recently, did business as **Amplify Funding** and operated the payday loan website amplifyfunding.com; Amplify Funding re-branded as LendUMo in early 2020 and now operates the payday loan website lendumo.com. Niswi means "three" in Ojibwe.

61.    LendUMo is beneficially owned by Andrew Dunn ("**Dunn**"), through his companies Soaren Management, LLC, and Kraken Holdings, LLC, both of which utilize a Phoenix, Arizona, address for their primary business address.

62.    Like Pruett, Dunn took little care to obfuscate his beneficial ownership of Niswi and, prior to consumer lawsuits in early 2020, reported tradeline data to FactorTrust under Niswi's name but with Soaren's email address, phone number, and Phoenix, Arizona, business address.

63.     The LDF Tribe claims to own **Niiwin, LLC**, which does business as **Lendgreen** and operates the payday loan website lendgreen.com. Niiwin means "four" in Ojibwe.

64.     Lendgreen is beneficially owned by 4Finance, S.A. ("**4finance**"), a large, worldwide payday loan conglomerate based in Riga, Latvia, which is in turn beneficially owned by Oleg Viktrovich Boyko, a Russian national with ties to the former KGB and whom *Forbes* magazine states is the 75th wealthiest Russian alive.

65.     Domain Name Registration records indicate the ownership of lendgreen.com to be Vivus Servicing, LTD ("**Vivus Servicing**"), in Ontario, Canada. Vivus Servicing is a wholly owned subsidiary of 4finance.

66.     The "rent-a-tribe" model is transparent with respect to Niiwin. Documents authorizing the LDF Tribe to incorporate Niiwin, LLC, as a "tribally owned" limited liability company under the LDF Business Development Corporation were signed on December 17, 2012. An operating agreement between LDF Holdings and Niiwin was signed on July 17, 2013. 4finance, vis-à-vis GMLA Trading Limited, a shell company based in Malta, provided a $20 million line of credit to Niiwin effective September 26, 2013, and lending operations began immediately thereafter. In return for its investment, 4finance received 95% of revenues and profits; after other expenses were deducted, the LDF Tribe received about 4%.

67.     In sum, despite supposedly owning a multitude of payday loan websites, transacting tens of millions of dollars in total revenues per month – a feat which would require hundreds, if not thousands, of employees in aggregate – each and every payday

lending website purportedly owned by the LDF Tribe states its business office to be at the same location: 597 Peace Pipe Rd., 2nd Floor, Lac Du Flambeau, WI 54538. **SEE PLAINTIFF'S EXHIBIT A.**

### States of Operation Vary Wildly Among Websites "Owned" by LDF Holdings

68.    LDF Holdings prohibits the non-Tribal investors to whom it rents its sovereign immunity from issuing loans in Wisconsin in order to keep the peace with local regulators in its home state.

69.    According to the LDF Tribe's director of business development, this conscious decision "keeps our relationship with the state of Wisconsin healthy." *See* Cary Spivak, *Lac du Flambeau Chippewa enter payday loan business with eye to online gambling*, Milwaukee Journal Sentinel, Dec. 29, 2013, http://archive.jsonline.com/business/lac-du-flambeau-chippewa-enter-payday-loan-business-with-eye-to-online-gambling-b99164952z1-237906421.html.

70.    LDF Holdings also refuses to lend to its own members.

71.    However, individual investors are free to determine the other states in which they choose to operate. Most investors who rent immunity from LDF Holdings opt to not lend in certain states whose attorneys general have taken punitive action against online lenders in the past, such as Virginia, or other states the individual investors may deem too risky. As the result of individual decision-making by dozens of different, independent owners, the exact states where payday loans are offered by LDF Holdings varies considerably from lender to lender. If LDF Holdings actually did own and manage the 50+

websites it claims to own and operate, it would be highly unusual to not have a global policy about doing business in particular states.

72.     For example, **Sky Trail Cash** will not make loans to consumers in Alaska, Arizona, Arkansas, Colorado, Connecticut, Washington, D.C., Georgia, Illinois, Kentucky, Maine, Maryland, Massachusetts, Minnesota, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Vermont, Virginia, West Virginia or Wisconsin. **Lendgreen** excludes lending in Arkansas, Connecticut, Georgia, Maryland, New York, Pennsylvania, Virginia, West Virginia, Wisconsin. **Evergreen Loans**, also supposedly owned by LDF Holdings, only prohibits loans in Wisconsin, Virginia, West Virginia, New York, and Arkansas.

73.     The highly inconsistent "excluded states" policies of the different LDF Holdings websites further evidences the fact that these decisions are not made by LDF Holdings but instead are decisions made by each individual website owner.

## LDF Holdings

74.     LDF Holdings and its subsidiaries are controlled by non-Tribal individuals: its president, operations director, and compliance director are not members of the LDF Tribe.

75.     Neither the LDF Tribe nor LDF Holdings provides the lending capital necessary to support LDF Holdings' payday lending operations or those of its subsidiaries.

76.     Neither the LDF Tribe nor LDF Holdings manages the substantive lending functions of LDF Holdings' payday lending operations or those of its subsidiaries.

77.    Lorenzo, the president of LDF Holdings, previously worked for Triax Management & Dater Portfolio between August 2015 and December 2016 as "**Director Of Sovereign Sales**." She has described her former employer's business model of renting the Tribe's name to non-Tribal entities as follows: "In today's ***regulatory environment*** it is very important to do business with people that will do things the right way. Triax and Dater have been building very successful businesses over the past 5 years. Our success formula is simple: **Identify Great Tribes, Financiers, Servicers and Best in Class Legal Teams** and have them work cooperatively to build a very profitable compliant business based upon consumer satisfaction." (**Emphasis added.**)

78.    On information and belief, Lorenzo now helps the LDF Tribe and LDF Holdings locate investors who are interested in forming payday loan businesses subject to "rent-a-tribe" agreements.

79.    The frequency with which LDF Holdings creates Tribal corporations specifically to benefit particular non-Tribal individuals, combined with the fact the president of LDF Holdings is a non-Tribal member apparently hired for her expertise in crafting "rent-a-tribe" agreements, heavily suggests that LDF Holdings is simply a rental agency for sovereign immunity rather than a lender.

### Cash Aisle Operated and Beneficially Owned by Bartlett/Preferred Call Services

80.    The main phone number for Cash Aisle is 844-359-6000; this is the only contact or customer service number displayed on cashaisle.com.

81.    When a customer calls this number, they are greeted with an automated message stating they have reached the "internet loan processing department." The generic

greeting is utilized because Preferred Call Services also handles call center operations for other payday lenders related to Bartlett, such as AAA Community Finance.

82.    Calling 844-359-6000 on September 4, 2020 and waiting for an agent to answer resulted in the agent quickly confirming the caller had, indeed, reached Preferred Call Services.

83.    The IP address for Cash Aisle is, as of September 6, 2020, 66.206.22.54, which corresponds to a physical location in **Tampa, Florida** – over 1,500 miles from the LDF Tribe's reservation in Wisconsin. The server is located at 8010 Woodland Center Blvd., Suite 700, Tampa, FL 33614 and is hosted by NOC4Hosts Inc., which markets itself under the name Hivelocity.

84.    Bartlett also owns AAA Community Finance, another payday lender.

85.    As of September 6, 2020, the IP address for AAACommunityFinance.com is 66.206.22.55, which also corresponds to a physical location in Tampa, Florida, and is hosted by NOC4Hosts Inc. at the same Tampa data center.

86.    Large data centers like those run by Hivelocity utilize giant racks of servers; an identical IP address other than an increase of 1 in the very last digit almost always indicates two servers physically next to each other in the data center.

87.    As of 2019, there were roughly 1.7 billion unique internet domain names. Each domain name has a unique IP address. To make the internet easier to navigate, the *Internet Corporation for Assigned Names and Numbers* ("**ICANN**") administrates a system of domain name servers which act as "phone books" and allow web browsers to quickly translate domain names entered by humans into machine-readable IP addresses.

For example, entering www.disney.com into a web browser results in it quickly querying Disney.com's name server, dens02.dig.com, which informs the web user's browser to connect to 23.221.223.96 – the IP addresses actually hosting Disney.com.

88.     The odds of any two random websites being hosted from servers with IP addresses one digit off from each other and resolving to servers physically next to each other is less than 1:1,700,000,000.

89.     Since name servers are analogous to phone books, most commercially used name servers contain hundreds of thousands of IP addresses, if not more. The name server for both AAACommunityFinance.com and CashAisle.com is NS1.PreferredCallCenter.com, which contains exactly seven IP addresses. Every domain on this name server directly relates to a Bartlett enterprise, including UnifiedMtg.com, the domain for the Bartlett-owned Unified Mortgage LLC in Lucie, Florida.

90.     The fax number listed for Unified Mortgage LLC on its website is (618) 377-9386; the fax number for AAA Community Finance is also (618) 377-9386.

91.     Upon information and belief, AAA Community Finance and Preferred Call Services operate a combined, joint call center operation and share a common office, employees and equipment. AAA Community Finance is a trade name or "doing business as" name registered to Bartlett's company, Dean Financial, LLC ("**Dean Financial**"). **SEE PLAINTIFF'S EXHIBIT E.**

### Lorenzo, LDF Holdings Sign Off on Sham 'Agent' Agreement With CRAs

92.     To successfully operate Cash Aisle, Bartlett and Preferred Call Services need access to detailed consumer data kept in the files of a number of ***Consumer Credit***

*Reporting Agencies* ("**CRAs**") which specialize in servicing the needs of the online payday loan industry, including Clarity Services, Inc. ("**Clarity**"), and FactorTrust, Inc. ("**FactorTrust**"). FactorTrust's parent company is Trans Union, LLC ("**Trans Union**"), and Clarity's parent company is Experian Information Solutions, Inc. ("**Experian**") – two of the "Big Three" nationwide CRAs.

93.     Without access to the hundreds of datasets contained on each consumer by these CRAs – everything from employment, salary information, IP addresses utilized, credit card balances, checking account overdrafts, real estate values, frequency of changes of addresses, and much more – the detailed, computerized underwriting analytics utilized by Cash Aisle would be virtually impossible to perform.

94.     Before being granted access to obtain reports, unfettered, by Clarity and FactorTrust, the CRAs required Cash Aisle to have subscriber accounts. Pursuant to the FCRA, the CRAs have to make reasonable efforts to verify the identity of new subscribers and ensure their reasons and purposes are legitimate for needing large amounts of consumer credit reports.

95.     It would be unlikely that a CRA would be willing to sell reports to an entity like Preferred Call Services – supposedly a call center which would have no permissible purpose to obtain reports for itself. Even if the CRAs were willing to sell reports directly to Preferred Call Services, then those CRAs would have to disclose the true name of Preferred Call Services, its address, and phone number, in disclosures given to consumers.

96.     Thus, as part of Cash Aisle's "rent-a-tribe" agreement, LDF Holdings agreed to appoint Bartlett and Preferred Call Services as Niibin's "agent" or "authorized

service provider," meaning that Bartlett and Preferred Call Services were authorized to obtain consumer reports ostensibly *on behalf of* Niibin. The agreements stipulate that the reports provided by the CRAs will only be used by Niibin, and Bartlett and Preferred Call Services would not use the reports themselves. In essence, Bartlett and Preferred Call Services certified to the CRAs that they were simply playing the role of mailman: picking up and delivering documents, and nothing else.

97.     In reality, the assurances of Bartlett and Preferred Call Services were meaningless, and they never intended to honor them. The agreements simply created a paper trail to make it *appear* that all parties were complying with the FCRA.

98.     The agreements were "win/win" scenarios for all parties involved:

a.   Bartlett/Preferred Call Services got access to the files of the CRAs and could therefore pull thousands of consumer reports monthly, enabling Bartlett/Preferred Call Services/Dean Financial to make, and collect on, a larger number of 700% interest consumer loans. FactorTrust was provided a physical address of 117 S. Prairie St., Bethalto, IL 62010 for Preferred Call Services, and FactorTrust's inspector made their investigation of Preferred Call Services, as agent for Niibin, at this address.

b.   LDF Holdings profits, since it receives a 2% "fee" or "commission" on loan revenues, which are primarily underwritten from CRA data.

c.   The CRAs – who get paid per report – were able to send an independent inspector to the offices of Preferred Call Services/AAA Community Finance/Dean Financial to document and photograph its offices, computer

systems, employees, etc., resulting in a positive inspection report for the CRAs to have in their files, should any legal or regulatory issues arise. This contrasts to the alternative of having an inspector visit a nearly empty office on the second floor of a cigarette shop in rural Wisconsin, which would almost certainly cause the inspector's report to recommend the subscriber not be considered verifiable, resulting in significant lost revenue for the CRAs.

99.    LDF Holdings is thus complicit in, and profits from, the façade that Niibin is the genuine end user of the reports.

100.    Bartlett and Preferred Call Services pay the invoices from Clarity and FactorTrust each month for all reports claimed to be sold to Niibin.

101.    Tradeline data – *e.g.*, consumer payment data on loans made by Cash Aisle – is reported to Clarity and FactorTrust by Bartlett's entities, Dean Financial and Preferred Call Services.

### How Cash Aisle Underwriting is Performed

102.    Once obtained, data in the reports is analyzed by software produced by Infinity Enterprise Lending Systems ("**Infinity**") in Sparks, Nevada. Infinity's sophisticated algorithms crunch the CRAs data and assign a proprietary risk score to the applicant. Bartlett and Preferred Call Services unilaterally determine the minimum qualifying score for a loan approval, the interest rate, repayment terms, and all other meaningful aspects of the loan. Neither Niibin nor LDF Holdings has any say in these matters.

103.    If a consumer is approved and elects to take out a loan, then completed loan documents and details are transmitted to an LDF Holdings employee in Wisconsin, who electronically "reviews" them and provides "final approval" to the loan while on LDF soil. While the LDF Holdings employee is technically empowered to reject the preordained outcome of approval and deny the loan, this rarely, if ever, happens.

104.    After the *pro forma* review by LDF Holdings, the loan is funded with money under the express and direct control of Bartlett, Preferred Call Services and Dean Financial.

105.    However, because of the rubber-stamp approval occurring in Wisconsin, the Defendants claim the Cash Aisle loans are "made" on the LDF reservation and subject exclusively to LDF tribal law.

### Defendants Pull Credit Report Impermissibly

106.    On November 7, 2019, Preferred Call Services and Bartlett, as agent or service provider for Niibin/Cash Aisle, requested a ***Credit Bureau Report*** ("**CBR**") from Trans Union regarding Ms. King. **SEE PLAINTIFF'S EXHIBIT F.**

107.    Trans Union's record of the inquiry shows the requesting entity as "CUSTOMER 4027 via FTNIIBIN LLC DBA CASH AI." *Id.*

108.    Due to idiosyncrasies in Trans Union's systems that produce consumer disclosures, inquiries originating from FactorTrust, but from which information is pulled from the consumer's Trans Union history, appear with the prefix "FT" appended. "Customer 4027" is an internal customer code used by Trans Union and is specific to the agent or service provider requesting reports for an end user.

109.     For example, "FTNIIBIN LLC DBA CASH AI" means Niibin, LLC, doing business as Cash Aisle, obtained via Factor Trust.

110.     Due to certain bugs and errors in system interfaces between FactorTrust and Trans Union, the address and phone number of the agent or authorized service provider is often displayed on consumer disclosures rather than the contact information for the claimed "end user" of the report.

111.     Indeed, Ms. King's Trans Union consumer disclosure shows the record of the inquiry regarding Niibin with a corresponding address of 117 S. Prairie St., Bethalto, IL 62010, phone 618-377-6700. *Id.*

112.     AAA Community Finance operates at 117 S. Prairie St., Bethalto, IL 62010. The phone number 618-377-6700 is utilized by AAA Community Finance.

113.     Pursuant to the FCRA, 15 U.S.C. § 1681b(f), any person requesting a CBR must have a *permissible purpose* for obtaining it.

114.     Preferred Call Services and Bartlett, pretending to be mere agents for Niibin /Cash Aisle, certified to FactorTrust, and, in turn, Trans Union, that Niibin/Cash Aisle was the end user of the report, and that Niibin/Cash Aisle had a permissible purpose to obtain the report because Ms. King had initiated a request for credit or some other business transaction directly with Cash Aisle.

115.     However, Ms. King did not apply for a loan or to transact business with Cash Aisle or AAA Community Finance, nor did she consent to a credit report being obtained regarding her by Niibin, Cash Aisle or any related entity.

116.    Even assuming, *arguendo*, that Ms. King had applied for a loan with Cash Aisle, there was still no permissible purpose pursuant to the FCRA for the Defendants to obtain a CBR, since the only loan Ms. King could possibly have been evaluated for was usurious and thus *void ab initio*; as such, no "credit transaction" could have even potentially occurred.

117.    Additionally, under this scenario, Bartlett and Preferred Call Services were prohibited by the FCRA from using the report obtained for any purpose other than the one certified to FactorTrust and Trans Union: procuring the report for delivery to Niibin, the end user of the report. Niibin was ***not*** the end user of report, and, as aforementioned, played no role in the analytics of the data contained in the report. It would not even conceivably have use for the report, much less have legal, permissible purpose to obtain it, directly or via agent.

118.    Congress defined the invasion of one's privacy as an injury-in-fact, and courts traditionally have recognized statutory violations rooted in privacy invasions as a basis for suit. *See, e.g., Thomas v. FTS USA, LLC*, 193 F. Supp. 3d. 623, 637 (E.D. Va. 2016) (finding that plaintiff asserted standing under §§ 1681b(b)(2) and 1681b(b)(3)); *see also Gambles v. Sterling Infosystems. Inc*., No. 15 CIV. 9746, 2017 WL.

119.    On information and belief, Preferred Call Services and Bartlett, as purported agents for Niibin/Cash Aisle, obtained Ms. King's CBR after it purchased her basic personal information – *e.g.,* name, address, date of birth, employer, banking information, etc. – from CashUSA.com, an online payday loan lead generator.

120.     CashUSA.com is a website that advertises how quick and easy it is to obtain a loan with their network of lenders. The website claims that its affiliated lenders make loans at annual interest rates between 5.99% and 35.99% annually, and shows a specific example, stating, "If you borrow $1500 over a term of 2 years with a representative APR of 7.9%, you will have 24 monthly payments of $67.77, for a total amount payable of $1,626.54."

121.     In reality, CashUSA.com sells the consumer data it harvests to many lenders who make loans at over 700% annual interest like Cash Aisle.

122.     Many of these online payday loan lead generators like CashUSA.com engage in deceptive and misleading tactics to hoodwink consumers into providing their personal information, which they then re-sell to illegally operating online payday lenders like Cash Aisle that offer loans at triple-digit interest rates, or, in some cases, the leads are re-sold to other lead generators.

123.     By way of example, one such payday loan lead generator was Zero Parallel, LLC ("**Zero Parallel**"). Zero Parallel, along with its owner, Davit Gasparyan, agreed to pay $350,000 in fines to the *Consumer Financial Protection Bureau* ("**CFPB**") in 2017; the CFPB alleged that Zero Parallel duped consumers into providing personal information about themselves and then re-sold these leads to online payday lenders that it knew were operating illegally.

124.     Once the leads are purchased from an online lead generator such as CashUSA.com, online payday lenders like Cash Aisle use sophisticated predictive

algorithms to determine which consumers may be financially distressed but are likely to make loan payments.

125.    Preferred Call Services and Bartlett, as so-called agents or service providers for Niibin/Cash Aisle, thus obtained Ms. King's CBR for *marketing purposes*, to see if she would qualify for a loan from Cash Aisle and would be a good prospect – someone whose credit report indicated that they may be desperate enough to take out a loan on unfavorable, illegal terms, but nonetheless had a steady source of income and an ability to re-pay such a loan.

126.    If a consumer like Ms. King is deemed a "match," she is flooded with text messages, emails, phone calls, and more, playing up the "quick and easy" loan terms offered by Cash Aisle and directing her to apply at its website, with no mention of the true cost of the loan.

127.    Cash Aisle's website, while disclosing in small print that it is a "tribally owned" company, nonetheless attempts to put a *positive* spin on its avoidance of state usury laws, explaining it is "licensed by the LDF Tribal Financial Licensing and Regulatory Agency" and touts under "compliance" it is a member of the *Online Lenders Alliance* ("**OLA**"). However, the OLA is a political action committee almost exclusively funded by donations from operators of online payday lending websites and which advocates for unrestricted payday lending, unimpeded by any government regulations.

128.    Further, decisions about who to buy leads from, when to obtain reports, what CRA to purchase reports from, and similar, are made by Preferred Call Services and

Bartlett, or, alternately, by Infinity, who is authorized to do so expressly by Preferred Call Services and Bartlett.

129.    Although Niibin's name and address appeared on the FactorTrust record of the inquiry, Niibin was not the actual end-user of the report, as all underwriting and data analytics are performed by Preferred Call Services and/or its non-tribal data analytic contractors (*e.g.*, Infinity), which are under the express control and direction of Bartlett.

130.    FactorTrust allows "end users" of its reports, like Niibin, to designate the address disclosed to consumers in the inquiries section of their consumer credit file disclosures. Not surprisingly, the Defendants elected to include a tribal LDF address.

131.    Factor Trust, in its disclosure to Ms. King, displays the address of the requesting party as PO Box 572, Lac Du Flambeau, WI 54538; this address belongs to LDF Holdings. **SEE PLAINTIFF'S EXHIBIT G**.

## Defendants are Subject to the FCRA

132.    The FCRA is a law of general applicability that regulates everyone within federal jurisdiction, including the LDF Tribe and its employees.

133.    The FCRA is implemented by the FTC, and many courts have held that the FTC Act applies to Indian-owned payday lenders. *See, e.g.*, *F.T.C. v. AMG Servs., Inc.*, No. 2:12-CV-00536-GMN, 2014 WL 910302, at *6 (D. Nev. Mar. 7, 2014) (holding that "the FTC Act is a federal statute of general applicability that under controlling Ninth Circuit precedent grants the FTC authority to regulate arms of Indian tribes, their employees, and their contractors" and rejecting payday lenders' argument that the FTC Act did not apply to them because of their claimed tribal affiliation).

134.     Ms. King has never set foot within the LDF Tribe's jurisdiction.

135.     Ms. King never agreed to be subject to the laws of the LDF Tribe.

136.     Ms. King never gave consent to Cash Aisle, or any of the Defendants, to obtain her credit report.

137.     The CBR that the Defendants acquired was never stored or compiled on tribal land.

138.     As aforementioned, the servers of Cash Aisle are not located on tribal land. However, even if the servers were on tribal land, the relevant issue is where Ms. King was located at the time she "consented" to the Defendants obtaining her CBR, had she so consented. *See California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960 (9th Cir. 2018).

139.     Indeed, courts have recognized that the consumer's location when a particular transaction occurred is relevant for jurisdictional determinations. *See Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, 769 F.3d 105, 115 (2d Cir. 2014) ("… the borrower seeks the loan without ever leaving the state, and certainly without traveling to the reservation. Even if we concluded that the loan is made where it is approved, the transaction … involves the collection as well as the extension of credit, and that collection clearly takes place in New York. The loan agreements permit the lenders to reach into the borrowers' accounts, most or all of them presumably located in New York.")

140.     LDF Holdings and Niibin are aware that CBRs are being obtained in their name by Preferred Call Services and Bartlett, and that in few, if any, instances will there be permissible purpose to obtain them pursuant to the FCRA. LDF Holdings has agreed to

allow Preferred Call Services and Bartlett to use the LDF Tribe's name and/or its related entities like Niibin to obtain CBRs without permissible purpose.

141.    Bartlett personally engineered the aforementioned hybrid system wherein his companies obtain CBRs and use those CBRs, all the while making it appear as if some far-off tribal company is the ultimate user of the report. Bartlett was aware of, condoned, aided, abetted, facilitated and signed sham agreements between his companies, the CRAs, and the rented LDF Tribe to obtain CBRs. Bartlett was keenly aware these policies would result in many reports – like the one obtained regarding Ms. King – being requested without any legal, permissible purpose.

142.    Ms. King has hired the aforementioned law firm to represent her in this matter, and has assigned her right to fees and costs to such firm.

## COUNT I
## VIOLATIONS OF THE FCRA

143.    Ms. King adopts and incorporates paragraphs 1 – 142 as if fully stated herein.

144.    The Defendants violated **15 U.S.C. § 1681b(f)**, which prohibits obtaining a consumer report except for a purpose for which the report is authorized and the purpose has been certified by the prospective user, when Preferred Call Services and Bartlett, pretending to be the agents or authorized service providers of the tribally owned Niibin, either willfully and intentionally or recklessly and without regard for a consumer's rights, requested a credit report regarding Ms. King by falsely claiming the information was needed because Ms. King had initiated a request for credit or some other business

transaction directly with Cash Aisle. However, Ms. King did not apply for a loan or to transact business with Cash Aisle, nor did she consent to a credit report being obtained regarding her by Niibin, Cash Aisle or any related entity.

145.    The Defendants violated **15 U.S.C. § 1681b(f)** when Bartlett and Preferred Call Services claimed Niibin was the end user of the CBR, when Bartlett and Preferred Call Services were themselves the actual end users of the report.

146.    Any loan which the Defendants even potentially considered Ms. King to be eligible for, if made, would have constituted criminal activity under Florida law; as such, the Defendants could not have made a loan in Florida to Ms. King and therefore had no possible permissible purpose to request her credit reports.

147.    Preferred Call Services and Bartlett purchased Ms. King's basic personal information from CashUSA.com, an online lead generator, and obtained credit reports without Ms. King's knowledge or consent to "pre-qualify" her for a loan.

148.    Niibin and LDF Holdings are jointly liable for such violations, since they acted in concert with Preferred Call Services and Bartlett, as they falsely certified that Niibin was the end user of reports, and a post office box rented by LDF Holdings is listed as the address of the requesting party on one of the records of the inquiry.

149.    The Defendants are liable for the above-stated violations of the FCRA, and Ms. King is thereby entitled to an award of statutory damages not to exceed $1,000 for each violation.

**WHEREFORE,** Ms. King respectfully requests this Court to enter judgment against the Defendants, jointly and severally, for:

    a.    The greater of statutory damages of **$1,000.00** per incident (for a total of **$2,000**) pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Ms. King's actual damages;

    b.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

    c.    Such other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Ms. King hereby demands a jury trial on all issues so triable.

Respectfully submitted on **October 28, 2020**, by:

 

**SERAPH LEGAL, P. A.**
/s/ *Brandon D. Morgan*
Brandon D. Morgan, Esq.
FL Bar # 1015954
bmorgan@seraphlegal.com
/s/ *Thomas M. Bonan*
Thomas M. Bonan, Esq.
FL Bar # 118103
tbonan@seraphlegal.com
2002 E. 5th Ave., Suite 104
Tampa, FL 33605
Tel: 813-567-1230
Fax: 855-500-0705
*Counsel for Plaintiff*

**ATTACHED EXHIBIT LIST**

A       Image of 597 Peace Pipe Rd., Lac du Flambeau, WI 54538
B       LDF Holdings Website – Operations Team Excerpt, Accessed April 30, 2020
C       LinkedIn.com Profile of Jessi Lorenzo, Accessed April 30, 2020
D       July 2013 *Inwewin* Article
E       Dean Financial's Wisconsin License to Operate as a Loan Company
F       Ms. King's Trans Union Consumer Disclosure, February 27, 2020, Inquiries
        Excerpt
G       Ms. King's FactorTrust Consumer Disclosure, February 27, 2020, Inquiries
        Excerpt